Brent K. HANSEN, Plaintiff–Appellee,

v.

John SOLDENWAGNER; Raymond Malecki; John Puleo, Defendants–Appellants,

City of Sunrise, Defendant.

No. 92–4846.

United States Court of Appeals, Eleventh Circuit.

April 21, 1994.

Robert H. Schwartz, Gunther & Whitaker, P.A., Ft. Lauderdale, FL, for defendants-appellants.

Michael R. Piper, Johnson, Anselmo, Murdoch, Burke & George, P.A., Ft. Lauderdale, FL, for City of Sunrise.

Arthur M. Wolff, Law Offices of Arthur M. Wolff, Ft. Lauderdale, FL, for plaintiff-appellee.

Before HATCHETT and EDMONDSON, Circuit Judges, and FRIEDMAN *, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

This case involves First Amendment claims brought by a police officer under 42 U.S.C. § 1983. The district court denied the individual defendants' motion for summary judgment based on qualified immunity. We reverse.

## BACKGROUND

Plaintiff Brent K. Hansen is a police officer for the City of Sunrise, Florida ("City"). Hansen was subpoenaed to provide deposition testimony in the criminal prosecution of a former City police officer, Martin Singer.

Singer had been arrested for burglary. Hansen gave the deposition testimony in July 1989.

During the deposition, Hansen criticized the City Police Department for prosecuting Singer. Hansen called the Singer arrest "ridiculous," "stupid," and "the dumbest thing I've ever seen since I've been working there;" Hansen recalled arriving on the scene of Singer's arrest and asking "how the fuck is that a good arrest?" He attributed the arrest to the "inexperience" of the officers involved, adding that "no one seems to give a shit up top" about the alleged inexperience and disorganization.

Hansen was also asked whether he had worked with Singer. Noting that Singer was a member of his squad, Hansen recalled praising Singer in an evaluation: "[H]e does real good.... [But] I've got to hear shit like what are you doing giving such a high evaluation which is a bunch of crap. And I don't have to listen to that."

In April 1990, defendant John G. Soldenwagner, the City's Chief of Police, learned of the testimony and ordered an Internal Affairs investigation. Shortly thereafter (but shortly before the scheduled start of Singer's criminal trial), defendants Raymond Malecki and John Puleo, officers in the Internal Affairs Division, conducted a hearing. Before the hearing, Chief Soldenwagner notified Hansen that the investigation charged him with "Conduct impairing efficiency of the Department to the detriment of discipline and/or public acceptance of the Department."

At the outset of the investigation, Hansen was assigned to desk duty, a step which was consistent with the department's "general policy." Hansen's salary was not reduced. The investigation concluded in September 1991, with a recommendation by Soldenwagner that Hansen be terminated. City Manager Patrick Salerno reduced the proposed disciplinary action to a five-day suspension.

Hansen filed a written grievance requesting that his suspension be reconsidered. Hansen admitted in the grievance that his

---

* Honorable Daniel M. Friedman, Senior United States Circuit Judge for the Federal Circuit, sitting by designation.

"conduct [in the Singer deposition] was unprofessional." Soldenwagner denied Hansen's request. In Hansen's final administrative appeal, Police Personnel Director James Harris concluded that the suspension was proper.

Hansen filed this action under 42 U.S.C. § 1983. Hansen alleged that defendants Malecki and Puleo, acting individually and in conspiracy with Soldenwagner, violated Hansen's First Amendment rights by investigating him and suspending him. Hansen also suggests that the investigation was initiated to deter him from testifying freely in Singer's trial. Defendants' motion for summary judgment was denied. Defendants appeal, reasserting the qualified immunity defense. We review this issue de novo. *Hutton v. Strickland,* 919 F.2d 1531, 1536 (11th Cir. 1990).

## QUALIFIED IMMUNITY

■ Qualified immunity protects government officials performing discretionary functions from civil liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Here, the parties do not dispute that defendants were performing discretionary functions, nor do they dispute which acts were taken. Thus to prevail, Hansen must show that defendants violated his "clearly established" federal rights and that every reasonable officer faced with the circumstances facing these defendants would have known that defendants' acts were unlawful. *Id.*

■ To be established clearly, a right must be so particularized that "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Pre-existing law—whether it be case law or statutory law—must be available to instruct in a concrete way the government agent, given the circumstances. "The contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." *Id.* (emphasis added). A recent en banc

decision explains plaintiff's considerable burden:

> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. *See, e.g., Edwards v. Gilbert,* 867 F.2d 1271, 1277 (11th Cir.1989). Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.

*Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,* 998 F.2d 923 (11th Cir.1993).

■ The question before us is not whether, in general, public employees enjoy some freedom under the First Amendment to speak on matters of public concern; they do. Nor is the question whether public employees have an interest in providing truthful testimony in criminal cases; they do. Here, as in all qualified immunity cases, the question is fact specific: in April 1990, was it clearly established in this circuit that it was unconstitutional for police officials to investigate and to suspend an officer for making vulgar, insulting, and defiant criticisms of the department while giving testimony at a deposition pursuant to a subpoena? The answer is "No."

Past cases show that defendants who allegedly violate public employees' First Amendment freedoms rarely act within "clearly established" contours of law:

> The Supreme Court has never established a bright-line standard for determining when the State as an employer may take action adverse to an employee in response to that employee's speech. Instead, the Court has balanced the interest of the employee in commenting on matters of public concern against the interest of the employer in performing public services efficiently.

*Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989) (citing *Pickering v. Board of Education,* 391 U.S. 563,

568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)).

Because *Pickering* requires a balancing of competing interests on a case-by-case basis, our decisions tilt strongly in favor of immunity by recognizing that only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated "clearly established" federal rights.[1] *See Dartland,* 866 F.2d at 1323–24. When "no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the *extraordinary* case where *Pickering* balancing would lead to the *inevitable* conclusion that the [act taken against] the employee was unlawful." *Id.* at 1323 (emphasis added); *see also Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1236–37 (11th Cir.1992); *Busby v. City of Orlando,* 931 F.2d 764, 773–75 (11th Cir.1991) (per curiam).

■ Hansen suggests that *Pickering* balancing is no good here; because he was subpoenaed, he says he enjoys an absolute First Amendment right to respond to deposition questions in the manner he chooses. That witnesses (without fear of unwarranted reprisal from government employers) be able to testify truthfully in court proceedings is a matter of public importance.[2] Public employees who allegedly suffer retaliation for providing testimony can enjoy protection under the First Amendment, *see, e.g., Reeves v. Claiborne County Bd. of Educ.,* 828 F.2d 1096 (5th Cir.1987); but the act of providing testimony does not, by itself, absolutely shield the public employee from further scrutiny by his superiors.[3]

In *Martinez v. City of Opa–Locka, Fla.,* 971 F.2d 708 (11th Cir.1992), we noted that "a public employee's right to freedom of speech is not absolute" when the public employee alleged that she had been terminated for providing unfavorable testimony, *under subpoena,* before a city commission. *Id.* at 712 (quoting *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989)). The *Martinez* court looked to *Pickering* and weighed "several factors" in deciding whether the testimonial speech overruled the government's interest in providing efficient services. *Id.* The decisions in *Dartland* and *Sims* make clear that, because this multi-factor balancing process admits of few bright lines, a government agent will know only in the most extraordinary circumstances that "what he is doing" does violate plaintiff's rights. *Dartland,* 866 F.2d at 1323; *Sims,* 972 F.2d at 1236–37.

1. *Pickering*-style balancing cases illustrate the importance of *Adams'* requirement that plaintiffs cite cases with materially similar facts when asserting that "clearly established" rights were violated. *Adams,* 962 F.2d at 1575. Even if *all* officials can be expected to know that some courts in some circumstances have struck the balance in favor of testimonial speech, not all reasonable officials would know whether the circumstances of this case—for example, vulgar and insulting words spoken by a police officer about his colleagues and superiors—might justify an investigation and suspension.

2. For the purposes of this appeal, we have assumed that Hansen testified truthfully.

3. In *Hoopes v. Nacrelli,* 512 F.Supp. 363 (E.D.Penn.1981), a police chief alleged that defendants, a mayor and members of city council, demoted the chief for cooperating with federal investigators and providing testimony at the mayor's trial on corruption charges. Despite noting that "a witness' testimony is certainly protected speech," 512 F.Supp. at 365, the court granted defendants' motion for summary judgment. *See also Bowen v. Watkins,* 669 F.2d 979, 986 n. 11 (5th Cir.1982) ("[w]e agree with the *Hoopes* court's view that statements injurious to close working relationships may be unprotected").

In *Arvinger v. Mayor and City Council of Baltimore,* 862 F.2d 75 (4th Cir.1988), a school police officer was fired for giving testimony in a co-worker's fair employment hearing that his superiors believed to be false. The district court found that "[s]peech given in the course of an official investigation of discrimination unquestionably qualifies as a 'matter of public concern.'" 862 F.2d at 79. The Fourth Circuit reversed, noting that the lower court had "improperly elevated context over content." *Id. See also Bates v. Hunt,* 3 F.3d 374 (11th Cir.1993) (governor immune from suit for terminating employee who "demonstrated hostility" to governor by voluntarily providing affidavit and agreeing to testify in co-worker's suit against governor).

Nor do courts afford absolute protection to private employees for testimonial speech. *See, e.g., Phillips v. Goodyear Tire and Rubber Co.,* 651 F.2d 1051 (5th Cir. Unit A 1981) (at-will employee had no cause of action when "sole reason" for his termination "was that he gave truthful testimony harmful to Goodyear's interests" in antitrust litigation).

Several considerations reveal that *Pickering* balancing, when applied to these facts, would not yield the "inevitable" result necessary for denying immunity.[4] Precedents recognize that the manner of a public employee's speech is an important element in the *Pickering* balance. *See Morales v. Stierheim,* 848 F.2d 1145, 1149 (11th Cir.1988); *Bryson,* 888 F.2d at 1567. Here, the outcome of a *Pickering* balance is especially uncertain because the manner of Hansen's speech was vulgar, insulting, and defiant. *Cf. Dartland,* 866 F.2d at 1324 ("rude and insulting" nature of speech, when considered in time, place, and manner considerations "gives speech an element of personal as opposed to public interest"); *see also Kannisto v. City and County of San Francisco,* 541 F.2d 841 (9th Cir.1976) (on-duty "diatribe" against superiors not protected).. Subpoenaed deponents may generally be free to criticize their employers—particularly when the criticism is relevant and is necessary to make the testimony truthful—but a subpoena to testify is no license to say with complete impunity whatever one wants in whatever words one chooses. A little insistence on decorum when a witness testifies is no big obstacle to the search for truth. And, it is not plainly unreasonable to expect a police officer to be able to give testimony in a criminal proceeding without resort to scatology.

Another fact that keeps the *Pickering* balance from falling "inevitably" in Hansen's favor is that some of his speech was not responsive to the questions put to him at the deposition. In such instances, the public interest considerations that flow from one's speaking as a subpoenaed witness are weakened, *if* they exist at all.[5] *Cf. Arvinger,* 862 F.2d at 78–79 ("The *Pickering* doctrine is not aimed at protecting the jobs of public employees in the face of any statement they might make on any subject.").

In this case, the *Pickering* balance is also affected—and its outcome made doubtful—by the special concerns of quasi-military organizations such as police departments. Order and morale are critical to successful police work: a police department is "a paramilitary organization, with a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers." *Bryson v. City of Waycross,* No. CV588–017, 1988 WL 428478, 1988 U.S. Dist. LEXIS 12645, at *9 (S.D.Ga. 1988), *aff'd,* 888 F.2d 1562 (11th Cir.1989); *see also Busby,* 931 F.2d at 774–75; *Hughes v. Whitmer,* 714 F.2d 1407, 1419 (8th Cir. 1983) ("More so than the typical government employer, the [highway patrol] has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution.'" (citations omitted)); *Kelley v. Johnson,* 425 U.S. 238, 246, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976) (noting "need for discipline, esprit de corps, and uniformity" in police departments); *Connick v. Myers,* 461 U.S. 138, 151–52, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983) ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.").

In his deposition, Hansen did not just describe events; he offered his opinion about

---

**4.** Because the only question in this case involves qualified immunity, we need not consider the actual result of a *Pickering* test. We simply illustrate why reasonable officers in these defendants' places would not *necessarily* know that their acts violated Hansen's allegedly "clearly established" rights. *See Dartland,* 866 F.2d at 1324.

**5.** For example, during cross examination at the deposition, Hansen was asked a question about Officer Singer, and he launched into the following tirade:

Q: Did you work with Officer Singer?
A: Yes, he was on my squad. And he does a great job. ... And, you know, like I did his evaluation about a couple of weeks ago and shit like what are you doing, and this evaluation is kind of high, isn't it.
Q: Who said that?
...
A: Rick Weir.
Q: Isn't he the Jewish guy?
A: No. I've got to hear shit like isn't this evaluation kind of high.
...
And certain people because of this I felt I've got to hear shit like what are you doing giving such a high evaluation which is a bunch of crap. And I don't have to listen to that.

578

the correctness of other officers' acts and judgments. He ridiculed as inexperienced the officers involved in the Singer arrest; he raked his superiors, claiming that "no one seems to give a shit up top" about the problems he perceived; Hansen lamented that he had to endure "shit" like criticism for his favorable review of Singer, defiantly claiming "I don't have to listen to that." *Cf. Busby,* 931 F.2d at 774 ("comments concerning co-workers' performance of their duties and superior officers' integrity" can directly interfere with morale and efficient operation of police force). Hansen—quite correctly, we think—admitted in his grievance documents that he acted unprofessionally at the deposition. Reasonable officials in defendants' positions could have believed that the efficiency of and the close working relationships of the City of Sunrise police force were threatened by Hansen's admittedly inappropriate speech, particularly when Hansen moved beyond testifying about historic facts and began to attack other officers.

Because this is not an "extraordinary" case in which the First Amendment conclusion would inevitably favor Hansen in the light of *Pickering* balancing, we conclude that the pre-existing law did not clearly establish that what defendants did was a violation of the First Amendment. Therefore, we hold that defendants in their individual capacity are entitled to qualified immunity.[6]

But Hansen says that summary judgment was still properly denied because there remain issues of fact about defendants' subjective motivation. That is, Hansen argues that a trial is required to determine whether defendants' proffered reasons for the investigation and suspension actually controlled. Hansen contends that defendants conducted the investigation to retaliate against his deposition testimony or to chill his testimony in Singer's trial, or both—not to maintain proper discipline within the police force.

For qualified immunity purposes, the subjective motivation of the defendant-official is immaterial. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040; *see also Mitchell v. Forsyth,* 472 U.S. 511, 517, 105 S.Ct. 2806, 2810, 86 L.Ed.2d 411 (1985) (in *Harlow,* "this Court purged qualified immunity doctrine of its subjective components"); *Busby,* 931 F.2d at 773, 775 n. 10 (First Amendment claim); *Von Stein v. Breshcer,* 904 F.2d 572, 579 (11th Cir.1990). The Supreme Court in *Harlow* staked a new path for immunity law by abandoning the subjective element of "good faith" immunity in favor of an objective test, that is, whether *a reasonable person* in the position of the defendant would have known that he was violating clearly established law. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. *Harlow's* objective standard would be rendered meaningless if a plaintiff could overcome a summary judgment motion based on qualified immunity by injecting the defendant's state of mind into the pleadings.

CONCLUSION

Because defendants are entitled to qualified immunity, we REVERSE the denial of summary judgment to defendants in their individual capacities and REMAND for further proceedings.

---

6. None of Hansen's citations of authority show that defendants violated clearly established law. *Broderick v. Roache,* 996 F.2d 1294 (1st Cir. 1993), was decided after the events underlying this case and, thus, was not pre-existing law. Also, the case law of one other circuit cannot settle the law in this circuit to the point of it being "clearly established." *Nicholson v. Gant,* 816 F.2d 591 (11th Cir.1987), did not involve police departments or vulgar speech. *Marshall v. City of Cape Coral, Fla.,* 797 F.2d 1555 (11th Cir.1986), was a case in which we concluded that the First Amendment was not violated when a city utility employee was fired after circulating a memorandum critical of his superior. *Nicholson* and *Marshall* are too different from this case to establish clearly the pertinent law.